## 10064

### CARMICHAEL *ET AL.* v. CARMICHAEL *ET AL.*
#### (96 S. E. 526.)

1. TRIAL—EQUITY CASES—SUBMISSION OF ISSUES.—Under the statute providing that a Judge who is to hear a chancery cause shall frame the issues upon which he desires the aid of the jury, when the case is continued to a subsequent term and tried by another Judge, such Judge is not bound by the issues made by the original Judge and may make another order of submission.

2. EVIDENCE—STATEMENT BY THIRD PERSON.—In a suit to set aside for fraud, a deed executed by a decedent, letter written by a daughter of the grantee in relation to the physician and mental condition of the grantor were incompetent, being merely the statements of a third person.

3. TRIAL—INTRODUCTION OF EVIDENCE—DISCRETION OF COURT.—Admission of testimony, proper only for the opening, after defendant has closed, is within the discretion of the trial Court.

4. WITNESSES — CROSS-EXAMINATION. — A party may cross-examine the witnesses of the adverse party on any subject pertinent to the issue.

5. TRIAL—CONDUCT OF COURT—EXPRESSION OF OPINION.—In an equity suit, tried to a jury, a statement by the Court during the examination of a witness, "The gentleman forgets there are 13 jurors on this case, and they better satisfy the thirteenth as well as the 12," was not erroneous as being the expression of an opinion.

6. TRIAL—INSTRUCTIONS—SUFFICIENCY.—In a suit to cancel a deed given by decedent to her brother for fraud, an instruction that it was competent for a woman to give her property to her brother was erroneous as ignoring the defense of a valuable consideration, where eight questions were submitted to the jury, none of which involved the sufficiency or nature of the consideration.

7. TRIAL—INSTRUCTIONS—APPLICABILITY TO EVIDENCE.—In a suit to cancel a deed for fraud, it was not error to confine the jury to the fraud of the defendant to the exclusion of the fraud of his agents, where there was no evidence that defendant acted through agents, or that any of such agents were guilty of any fraud.

8. EVIDENCE—PRESUMPTIONS.—Extreme weakness of body raises no presumption of weakness of mind.

9. TRIAL—INSTRUCTIONS—APPLICABILITY TO ISSUES.—In a suit to cancel a deed for fraud, it was not error to refuse to charge that a grossly inadequate consideration is a badge of fraud, where sufficiency of the consideration was not submitted.

10. APPEAL AND ERROR—REVIEW—QUESTIONS OF FACT IN EQUITY CASES.— In a suit to set aside a deed for fraud, tried to a jury, where the verdict found that there was no fraud, the appellate Court has no jurisdiction of such question.

Before PRINCE, J., Dillon, Spring term, 1917.    Affirmed.

Action by A. B. Carmichael and others against W. D. Carmichael and others.    Judgment for defendants, and plaintiffs appeal.

*Messrs. Joe P. Lane* and *Townsend, Rogers & McLaurin,* for appellants, cite: *As to issues for jury in equity cases:* Code of Civil Procedure, sec. 312; Circuit Court Rule 28; 76 S. C. 509; 65 S. C. 455; 34 S. C. 69; 13 S. C. 332; 49 S. C. 425; 27 S. E. 467; 49 S. C. 345.   *As to public policy and fraud:* 61 S. C. 505; 87 S. C. 4-5; 57 S. C. 421-426; 5 Rich. Eq. 461; 30 S. C. 478; 24 S. C. 10; 89 S. C. 270; 57 S. C. 425; 108 S. C. 271; 30 S. C. 469.   *Finding of jury without weight:* 5 Rich. Eq. 461; 30 S. C. 469; 24 S. C. 10; 64 S. C. 69; 57 S. C. 425-426; 87 S. C. 5; 4 DeSaus. 690-691, 686.

*Messrs. Walter Stackhouse, Gibson & Muller* and *Henry Buck,* for respondent, cite: *As to effect of verdict of jury when it has not been set aside:* 106 S. C. 328.   *As to Judge not being bound by the order of the Court at a previous term submitting issues to the jury, there having been no order continuing the issues:* Code of Procedure, sec. 312; Circuit Court Rule 28; 65 S. C. 458; 54 S. C. 352; 43 S. C. 299; 76 S. C. 507.   *As to harmless error:* 63 S. C. 109; 65 S. C. 490; 75 S. C. 136; 54 S. C. 352.   *As to the findings of the Court:* 16 S. C. 340; 64 S. C. 256; 90 S. C. 196; 107 S. C. 470.   *As to the duty of support being an express consideration of the deed, and the power of the Court to require grantee to carry out his contract:* 64 S. C. 256.   *As to the exclusion of certain letters written by a witness—said letters not having been shown to have been written under the authority of or at the suggestion of respondent:* 61 S. C. 292; 52 S. C. 428.   *As to the bona fides of the transaction:* 54 S. C. 256; 89 S. C. 352; 106 S. C. 328; 14 S. C. 217; 83 S. C. 190; 92 S. C. 113.   *As to the Court requiring the will introduced by plaintiffs, to be proven by one of the sub-*

*scribing witnesses, and allowing defendants' attorneys to cross-examine him generally:* 16 S. C. 550; 41 S. C. 122; 58 S. C. 74.   *As to remarks made by the Court in the presence of the jury:* 73 S. C. 382; 61 S. C. 17; 71 S. C. 142; 72 S. C. 352; *Pierce v. Marion County Lumber Co.* (not yet reported).

August 2, 1918.

The opinion of the Court was delivered by MR. JUSTICE FRASER.

This is an action to set aside a deed (if it was executed) for fraud.

The deed was executed, and there was no fraud.

The undisputed testimony is:

Mrs. Margaret Carmichael Perritt was a childless widow. Mr. Perritt, her deceased husband, was a widower with children by a former marriage when he married Miss Carmichael. There were some white people living on Mrs. Perritt's place for a time after her husband's death. They moved away leaving her alone, except for the presence of two colored servants who lived in a servants' house near by, It was noticed by some of Mrs. Perritt's friends that the cooking stove and other things were removed from Mrs. Perritt's house to the servants' house. Mrs. Perritt spent much of her time in visiting her friends and relatives, but still she spent much of her time alone at her home. One of her neighbors, Mr. Charlie Rogers, and her half-brother, W. D. Carmichael, were very kind to Mrs. Perritt and assisted her in her business. Mr. W. D. Carmichael was attentive to his sister, Mrs. Perritt, during Mr. Perritt's last sickness and after his death.

There is evidence unobjected to and uncontradicted that the respondent offered Mrs. Perritt a home with him and his family immediately after her husband's death, but she did not accept it. It was noticed that Mrs. Perritt ate

heartily for the first few meals after coming from her home,
and her friends suspected that the servants were neglecting
her.

The record shows:

"During the year 1913, after her illness, she had two old
negroes staying with her.    Well, I don't know that she com-
plained much about that; she said she was alone a .good deal
of the time.

"They were supposed to cook and care for her.    A. That
was in the daytime.    I think that one or the other stayed
there.    She only stayed there a short time in that spring
that she left there.    I think she went there in February and
left in March.    Only stayed there about a week.    I guess
it is true that during that time these negroes were supposed
to prepare her food.    I could not say about her not getting
proper food at her home.    She had the appearance of not
getting the proper attention some way.    Well, I don't know
exactly the day of the week that I took her to Mullins to see
Mrs. Bell Smith (a stepdaughter of Mrs. Perritt), but it
was something like two weeks before she went to Marion.
She stayed with Mrs. Smith about two days, and then came
back home.

"Yes, sir; Mrs. Smith came to see her after that.    She
asked me to go with her to see Mrs. Perritt, and I went.
Mrs. Smith wanted me to be a witness to that conversation,
and I went over there after Mrs. Smith got there, and Mrs.
Smith said to Mrs. Perritt in my presence, at that time, that
she thought Mrs. Perritt ought not to stay there any longer:
she ought to break up and leave there.    And Mrs. Smith
told Mrs. Perritt in substance about this : That she ought to
go and live with some of her people, that she had too many
people that would be glad to take her, for her to live there
in the shape she was in at the time.    She offered to take her.
She said that 'any of us would be glad to take you.'    She
said she did not think there was one but what would be
glad.    I really don't recall her saying that 'she didn't have

room at her house, but would build one if necessary.' She might have said something like that.   Q. Now, Mr. Rogers, didn't Mrs. Smith advise her at that time to make a paper of some kind to whose home she went, giving that party to whom she went her property?   (Objected to.)   The Court: It is a conversation had with the deceased, and the question is why she made this deed, and anything that will throw light on the animating, prompting cause in making this deed—  Mr. Rogers: If your Honor will pardon me, this is advice volunteered by a stranger.   The Court: Well, the jury and I will consider that.

"Yes, sir; Mrs. Smith advised Mrs. Perritt to fix her property in writing, so that whoever she lived with could use her property for her support, as she thought she had a plenty to live on her lifetime.   Mrs. Smith further stated that if her property was not sufficient for her (Mrs. Perritt) that she (Mrs. Smith) would be glad to give her her interest in the John E. Perritt estate, if she didn't have enough to support her.   Mrs. Smith further said that the other Perritt heirs would do the same thing.   No, sir; they did not tell me to send for Mr. W. D. Carmichael.   I was going to Marion that day, and they told me to tell him to come out there.   Both of them asked me, it was agreed between them, I could not say positively which one asked me.   Both of these together, and both asked me to ask Mr. W. D. Carmichael to come out there.   Mr. Carmichael came, I think the next day, on Sunday, and he came in response to that request; but I did not tell Mr. W. D. Carmichael.   Before I got to Marion, I think he got a message from Mrs. Smith. I went to tell him, and he told me about getting the message from Mrs Bell Smith to go to see Mrs. Perritt; and he told me he would go the next day, and he did go.   Q. Did they tell you what they wanted you to go to Mr. Carmichael's for?   A. They told me what they wanted with Mr. Carmichael; they did not tell me to tell Mr. Carmichael.   They wanted to talk this plan over with Mr. Carmichael, that they

were trying to make, I guess, they wanted to know if he would not take her into his home. Mr. Carmichael went and Mrs. Carmichael went with him. I saw Mrs. Perritt frequently. Well, I really don't know whether Mrs. Perritt could understand a contract or not. She was pretty weakly, but her mind was, I reckon it was as good as any old lady at that age. She was right feeble, and awful weak at the time. She was always a rather independent old lady and wanted to pay for what she got, she always was that way, and she was not very easy persuaded if she didn't want to do a thing. Q. She was what you might call pretty stubborn or contrary sometimes, had a will of her own? A. Yes, sir; she had a will of her own and always had had. My wife's name is Georgia. Well, I have heard her talk that talk in speaking of giving her property away; that, if anybody ought to have it, Mr. W. D. Carmichael or my wife ought to have it. I have heard her say that Mr. W. D. Carmichael did more for her than anybody in the world. She believed any of them would do for her. Well, she talked that way; that is, that Mr. W. D. Carmichael and my wife ought to have the property in preference to the others."

The record further shows that the respondent told Mrs. Perritt that his home was open to her whether she made the conveyance or not. The record shows that a day was fixed for the respondent to go for Mrs. Perritt and take her to his home, but he did not go that day, as the weather was bad. The record shows that Mrs. Perritt preferred performance of an agreement to excuses for nonperformance, and the respondent took the risk of offending her by the delay. The respondent took the risk, as he seemed to have preferred his sister's good to her good will. Mrs. Perritt promptly sent for her regular attorney, Mr. Hughes, who was a son-in-law of the respondent, and asked him to draw up the conveyance. Mr. Hughes drew up a conveyance and carried it to Mrs. Perritt for execution. Mrs. Perritt read it over and asked for additional provisions. Mr. Hughes then drew up

the conveyance which Mrs. Perritt executed and is the sub-
ject of this action.   Mr. Hughes asked Miss Nina Car-
michael to get two witnesses, and she called in Dr. Brown
and his wife, who were then next door neighbors, to act as
witnesses.   After its execution, Mr. Hughes, for Mrs. Per-
ritt, delivered the conveyance to the respondent and he had
it recorded.   The record shows that neither the respondent
nor any member of his family, except Mr. Hughes, who was
Mrs. Perritt's attorney, were in the room when the convey-
ance was executed.   A few days after the conveyance was
executed, Mrs. Perritt suffered a stroke of paralysis and
lingered only a short time before she died.   This suit was
brought to set aside that conveyance for fraud.

1. In god time the plaintiff made a motion to have issues
framed for trial of issues by a jury.   This motion was heard
by Judge DeVore, who passed an order framing issues for
the jury.   Before the motion was determined, the
respondent was injured.   The order framing issues
was passed when it was known that the cause could
not be tried by Judge DeVore.   The cause was continued and
tried at a subsequent term by Judge Prince.   Judge Prince
refused to be bound by the statement of the issues as made
by Judge DeVore and made another order submitting sub-
stantially the same questions.   This order is the first ques-
tion on this appeal.

Was Judge Prince bound by the order of Judge DeVore?
The appellant admits that this Court said, in *Montague v.
Best,* 65 S. C. 455, 43 S. E. 963 :

"It would seem that issues in chancery cases framed under
this section were intended for the aid of the Judge who
framed the issues, and that the order framing such issues
for that particular term and Judge would not survive the
term, unless by special order such issues were continued
along with the cause."

Appellant claims that this was merely *obiter dictum.*   It
makes no difference whether it was dictum or decision.   It

is very clear that the statute provides that the Judge who is to hear the cause shall frame the issues upon which he desires the aid of the jury.    This question is overruled.

2. Was the Judge in error in excluding the letters of Miss Nina Carmichael?

The appellants offered two letters written by Miss Nina Carmichael, a daughter of the respondent, in relation to the physical and mental condition of Mrs. Perritt soon after she got to respondent's home.    These letters were merely the statement of a third person and incompetent.    Miss Carmichael was plaintiff's witness. The question, "Who kept her from falling in the fire?" assumed a fact that had not been proved.    The question, "When you saw her, could you understand what she said?" was a question for the opening, and the admission of such testimony after the defendant had closed was in the discretion of Judge Prince, and he exercised it wisely.

3. The next question is: Can a witness be put up by a party for one question only, and the other party be denied the right to cross-examine the witness on other matters?    The rule in this State is that a party has the right to cross-examine the witnesses of the adverse party on any subject pertinent to the issue.

4. Judge Prince said during the examination of a witness: "The gentleman forgets there are 13 jurors on this case, and they better satisfy the thirteenth as well as the 12."

The error claimed is that it was an expression of opinion The statement did not express an opinion.    It was simply a warning to respondent's counsel not to object too much. If there was prejudice to either side, it was to respondent, and not to appellants.

5. Exception 18 complains that, while the answer had set up a valuable consideration, his Honor charged the jury that

it is perfectly competent for a woman to give her property to her brother. Eight questions were submitted to the jury, and not one of them involved the sufficiency or nature of the consideration and could not have influenced their answers to the interrogations. This applies also to exception 19. These exceptions are overruled.

6. Exception 21 complains of error, in that his Honor confined the jury to the fraud of the respondent and did not allow them to consider the fraud of his agents. There is no evidence in the case that the respondent acted through agents, nor that Miss Nina Carmichael, Mr. Hughes, nor any one else, who is claimed to have acted as his agents, was guilty of any fraud. This exception cannot be sustained.

7. The appellant complains that the presiding Judge refused to charge that the extreme weakness of body raised a presumption of weakness of mind. We know of no such presumption.

8. The appellant complains that his Honor refused to charge that a grossly inadequate consideration is a badge of fraud. The sufficiency of the consideration was not one of the questions submitted to the jury, and the charge would have been irrelevant, and the request was properly refused. His Honor considered the sufficiency of the consideration in his decree, and his finding is approved. The record shows that the respondent, more than any one else, was kind to Mrs. Perritt. However valid the excuses of the others may be, the respondent was her principal helper. It was natural, it was commendable, that she, having no children of her own, should desire to give to him, from whom she had received a brother's love and attention, the property that she owned. The record showed that Mrs. Perritt had a commendable pride and desired to pay for what she received. The fear that we may become an object

of charity in our old age is the *bete noir* of many a life.
The most natural thing for such a woman is to do just what
Mrs. Perritt did.

9. Was there fraud in the case? This is a chancery case
in which the facts were settled by a jury and the ver-
dict not set aside. This Court has no jurisdiction of
that question. *Tuten v. McAlhaney,* 106 S. C. 337,
91 S. E. 328.

The judgment is affirmed.